John D. Bennett, S.
In this contested nonjury prohate proceeding, decision has been reserved on the proponent’s motion to dismiss the objections at the close of the contestants’ case.
The first five objections relate to the execution of the propounded instrument, and to the contestants’ claim that the decedent, being illiterate, did not know the contents of the instrument offered for probate.
The decedent was a foreign-born resident of this country who, according to the petition, was not a citizen, although she had apparently resided here for many years. She spoke a foreign language, a Slavic tongue, referred to by different witnesses as Polish, Lithuanian or Ukranian, and at times she also used the English language. The propounded instrument is signed with an “X”.
Under circumstances where the decedent is illiterate, the proponent must show more than the usual factum of subscription and execution by the decedent (Matter of Regan, 206 App. Div. 403). The facts adduced establish satisfactorily such compliance by the proponent. The attorney draftsman and all the subscribing witnesses attested that the will was read to the decedent and, at the time of execution, she herself stated in English that “ she wanted everything left to John Fescura ”.
Objections numbered one through five inclusive are accordingly dismissed, it having been established that the propounded instrument was executed in the manner prescribed by section 21 of the Decedent Estate Law.
The contestants’ major assertion is that the decedent was allegedly suffering from insane delusions or hallucinations which affected the terms of the will. To substantiate these claims the contestants introduced testimony that the decedent would threaten her grandsons with bodily harm, stating that *1088 she would kill them, and at different times she assaulted them with various weapons, including an axe and sticks. She is also alleged to have prayed to God that her grandsons die, uttering these words while hanging up a crucifix at the door of the house. At other times she reported conversations with deceased members of her family, including a son Louis and her husband.
As against this evidence, the proponent has shown that the decedent was over 80 years of age, and that she had lost all four of her sons, including the son Louis whom she had loved very much. This son was the beneficiary of her entire estate by an earlier will, and after Ms death this prior will was physically destroyed in the presence of an attorney. Even her grandson, one of the witnesses who testified to her peculiar behavior, admitted that a short time after the execution of the propounded instrument, and at the time a lease was executed by the decedent, her acts impressed him as being rational. Further, this same witness and another grandson admitted that the decedent raised cMckens, fed them, sold the eggs, paid her fuel bills, paid her taxes, and in general ran and managed her own home where she lived alone, and took care of her financial affairs.
There is no evidence whatever to show that any or all of the eccentricities or peculiarities of the decedent, such as talking to departed members of her family, had the slightest connection with or influence upon her testamentary disposition here in question. It is clear that she knew and fully understood that her son LoMs was dead by the very fact that subsequent to his death she revoked her former will in his favor. As the court said in Matter of Vedder (6 Dem. 92, 99-100), “ The doctrine, that any insane delusion incapacitates from making a will, is not followed in tMs State. The rule here seems to be well settled, that mental capacity is to be measured by its relations to the testamentary act. It has, therefore, been held that a person having any insane delusion relating to the property, the persons concerned, or the provisions of the will, is incapable; while delusions which in no way relate to these do not, as a matter of law, incapacitate, for they involve no more likelihood of actual incapacity than many other latent causes. * * * A believer in witches and witchcraft, in spiritualism ® ° ° may make a will
There is ample testimony to support the finding that the decedent disliked her grandsons bitterly. There were continual conflicts between them over her property, a portion of which she had leased to them, and over the boundaries of this property. At times the decedent physically interfered with the control of the leased premises and with the management of the *1089 grandsons ’ business. However, it is one thing to say that she was extremely unfriendly to her grandsons, and another to find that she exhibited an insane delusion with regard to them.
In a similar vein the court in Bull v. Wheeler (6 Dem. 123, 126-127) said: “An insane delusion is exhibited in the belief of facts which no rational person would have believed, and the inability to be reasoned out of such belief * * * After carefully considering all the testimony in the light of this legal definition of an insane delusion, I am unable to see in Miss Bull’s feelings and conduct towards her brother anything more than an intense dislike — perhaps hatred — of him * # *. Now whether this dislike was justly or unjustly entertained is not, in law, material — for the law recognizes the fact that all are more or less influenced in the disposition of their property by their likes and dislikes, and it will not interfere even though natural claims are ignored for the reason that, generally speaking, one may dispose of his own as he chooses ”.
However, far from it being an unnatural disposition, the evidence as so far adduced reveals that John Fescura, the sole beneficiary, was raised by the decedent as her own son from infancy. He was a grandnephew of her deceased husband.
The contestants’ proof also fails to establish that the propounded instrument was procured by fraud and undue influence of John Fescura, the person named in the objections. The most that can be said for this contention is that Mr. Fescura brought the decedent to the attorney draftsman on their first meeting, introduced the decedent to the attorney, and apparently exercised some control over some of her money and may have paid some of her bills. On the other hand, he was not present on the date of the execution of the instrument, nor did he accompany her to the attorney’s office.
In Matter of Walther (6 N Y 2d 49) the court held that the fact that the draftsman was a stranger to the decedent and was solicited by the proponent did not support a finding of undue influence, in view of the procedures followed in drafting and executing the document, and that further the mere fact that one is the sole legatee or sole distributee is not in itself evidence of the exercise of undue influence.
Accordingly, the court holds that the decedent was of sound mind, that she was not unduly influenced by any person in the disposition made of her property, nor did there exist in her mind any insane delusion which affected such disposition.
Proponent’s motion is granted and the objections are dismissed. The propounded instrument will be admitted to probate.